# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION** |
| **v.** | ) | |
| | ) | **NO.  4:21-40004-TSH** |
| **JOEL POLANCO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## ORDER AND MEMORANDUM ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Docket No. 43)

### March 14, 2022

**HILLMAN, D.J.**

The defendant, Joel Polanco, is charged with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  The defendant moves to suppress statements he made to officers during an investigatory stop and a letter he attempted to mail while at the Worcester County House of Corrections.  The motion is ***denied in part*** and ***granted in part***.  The motion is denied as to the challenged statements because the statements were not the product of a custodial interrogation.  The motion is granted as to the letter because the government did not establish that it seized the letter pursuant to an established practice.

### Background

At 12:45 P.M. on October 24, 2020, police responded to a reported shooting near the intersection of Cherry Street and Snow Street in Fitchburg, Massachusetts.  A man with dread locks and a white shirt had been seen leaving the area.  At the scene, police found a man on the ground with a gunshot wound to his right leg.  At 12:50 P.M., one street over and approximately

one-tenth of a mile away, Officer Antonio Pennetti encountered the defendant, who had dread locks and appeared to be taking off a white shirt.

Officer Pennetti, without drawing his weapon, told the defendant to put his hands up.  The defendant complied, but first grabbed something out of his pocket and tossed it to the ground.  As Officer Pennetti approached the defendant, Officer Pennetti said, "That was fucking stupid."  In response, the defendant said that he was on probation, that he had some weed, and that he did not want to get in trouble.

Officer Pennetti told the defendant that he was not under arrest but that he matched the description of "a situation that had happened down the street."[1]  Officer Pennetti then placed the defendant in handcuffs.[2]  Officer Pennetti pat frisked the defendant; he did not find any weapons.  The defendant told Officer Pennetti that he saw the person down the street having an argument, that he tried to help the person, and that he then left to go to the park to shoot hoops.

As Officer Pennetti walked the defendant to his cruiser, Officer Penetti said to the defendant, "I don't know why, I want to call you Josh Membrino."  The defendant responded, "No, it's Joel Polanco, you remember me from Meadowbrook."  Officer Pennetti informed the defendant again that he was not under arrest but directed the defendant to sit in the back of his cruiser until he "could figure out what was going on."

Officer Pennetti found a bag containing a small amount of marijuana where the defendant had tossed the item from his pocket.  Officer Pennetti asked Officer Brian Gelinas to stay with the defendant while he continued to search the area.  Around 1:33 P.M., Detective Jeff Hurley arrived

---

[1] Officer Pennetti did not describe the situation as a shooting.

[2] Officer Pennetti testified that he was concerned for his safety; he was responding to a call of shots fired, and the defendant had reached into his pocket after being told to put his hands up.

on the scene.  The defendant was still in the cruiser with Officer Gelinas.  The defendant asked Detective Hurley what was going on; Detective Hurley responded that he did not know because he had just arrived; the defendant stated that he had been "helping the guy on the street."  Detective Hurley did not ask the defendant any questions.  At 1:48 P.M., the defendant was placed under arrest.

Thereafter, the defendant was taken to the police station.  Prior to being charged with a federal offense, the defendant was charged with several state offenses.  He was ordered to pretrial detention, without bail, at the Worcester County House of Corrections.  While there, he attempted to mail a letter to Francheska Polanco, the mother of his children.  The letter described the shooting.  On the envelope containing the letter, the defendant wrote Francheska Polanco's name and address in the middle, his own name and return address in the upper left-hand corner, and "Free" in the upper right-hand corner.  The defendant did not place a postage stamp on the envelope.

Deputy Sheriff John Sables of the Worcester County Sheriff's Office, who works inside the Worcester County House of Corrections and whose responsibilities include monitoring mail correspondence inside the jail, reviewed the defendant's envelope to determine whether it could be mailed.  Deputy Sheriff Sables testified that because the envelope did not contain postage, and because the defendant had sufficient funds in his inmate account, the envelope had to be returned to the defendant for appropriate postage.  Deputy Sheriff Sables further testified that since the letter was being reintroduced back into the jail, the envelope had to be opened to ensure there was no contraband or information that would jeopardize the security and orderly running of the jail.

Deputy Sheriff Sables explained that, in his training and experience, inmates intentionally fail to place a postage stamp on an envelope and write "free" in the upper right-hand corner as a way of communicating with one another inside the facility.  He described that, for example, Inmate

3

A may write Inmate B's name as the return address in the upper left-hand corner and "free" in the upper right-hand corner.  If Inmate B has sufficient funds in his account, the letter from Inmate A will not be mailed out, but instead will be sent to Inmate B.  Deputy Sheriff Sables testified that this was among the concerns he had regarding the defendant's envelope, leading him to open it.[3] Upon opening the envelope and reviewing the letter, Deputy Sheriff Sables observed a reference to a shooting and turned the letter over to the Worcester County District Attorney's Office.  Deputy Sheriff Sables testified that inspecting the defendant's letter was consistent with his understanding of the jail's mail policy.

The Worcester County Sheriff's Office Inmate Handbook (the "Inmate Handbook") outlines a policy on incoming and outgoing mail for pretrial detainees.[4]  Inmates at the jail are advised of the mail policy through the Inmate Handbook.  As to incoming mail, the Inmate Handbook states that all incoming non-privileged correspondence will be photocopied for security reasons.  It further states that all incoming non-privileged correspondence will be opened to record the receipt of any funds enclosed for the inmate, to verify and record the receipt of permitted personal property, and to prevent the transmission of contraband to an inmate.  As to outgoing mail, the Inmate Handbook states that all outgoing correspondence that does not contain the

---

[3] Deputy Sheriff Sables also testified, however, that he had no specific information on the defendant being involved in criminal activity.

[4] Apart from the Inmate Handbook, the jail also maintains an additional policy document outlining policies on mail and communications.  This additional document is available to officers, not inmates.  The policy in the additional document does not materially differ from the policy in the Inmate Handbook.  Without elaboration, however, the document also notes, "The Assistant Deputy Superintendent (ADS) of Special Services or the Superintendent may authorize the reading of non-privileged mail to maintain security, protect an individual, or for public safety purposes." No evidence was presented at the suppression hearing concerning any authorization from the ADS.

inmate's name, return facility, and a stamp on the outside of the envelope (if the inmate is not indigent) will be rejected and returned to the inmate (if known).[5]

Here, as mentioned, the defendant is charged with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  He moves to suppress the statements he made to officers during the stop and the letter intercepted by the jail.[6]

### Discussion

*1. Statements*

The defendant argues that his statements to officers must be suppressed.  "Any statements obtained as a result of custodial interrogation in the absence of *Miranda* warnings must be suppressed." *United States v. Jackson*, 544 F.3d 351, 356 (1st Cir. 2008).  The term "interrogation" refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  "A volunteered statement is not the product of interrogation and is not subject to suppression, even if warnings have not been provided." *Jackson*, 544 F.3d at 357.  A defendant is in "custody" when the circumstances surrounding the interrogation objectively constitute the restraint on freedom associated with a formal arrest.  *See United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011).

The defendant was not in custody when Officer Pennetti said, "That was fucking stupid." Officer Pennetti had just stopped the defendant and, without drawing his gun, told him to put his

---

[5] The Inmate Handbook also contains a provision on inmate rights, which states that inmates have a right to uncensored correspondence to or from governmental authorities, as well as to or from persons other than governmental authorities.

[6] The defendant has withdrawn his request to suppress clothing seized incident to his arrest.

hands up.  This was a valid *Terry* stop,[7] and the requirements of *Miranda* had not yet been triggered.  *See United States v. Trueber*, 238 F.3d 79, 92 (1st Cir. 2001).

Once the defendant was handcuffed, however, the defendant was "subjected to restraints comparable to those associated with a formal arrest."  *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984).  At that point, the defendant was in custody.  While the defendant was not given a *Miranda* warning, the officers' brief statements to the defendant were not reasonably likely to elicit an incriminating response.

Officer Pennetti's statement to the defendant that he was not under arrest but matched the description of a situation that had happened down the street was brief, non-confrontational, and did not directly accuse the defendant of a crime or seek to inflame his conscience.  *See United States v. Genao*, 281 F.3d 305, 311 (1st Cir. 2002).  Officer Pennetti's statement that he thought the defendant was someone else, moreover, was, at most, an indirect request for the defendant's name, a request an officer permissibly may make prior to reading a *Miranda* warning.  *See United States v. Sanchez*, 817 F.3d 38, 45 (1st Cir. 2016).  Finally, Detective Hurley's statement to the defendant was not reasonably likely to elicit any response.  The defendant's statements to Detective Hurley were, in essence, "blurted out . . . without prompting."  *Jackson*, 544 F.3d at 360.  Because none of the challenges statements were the product of a custodial interrogation, suppression is not warranted.

## *2. Letter*

The defendant also argues that suppression is warranted of the letter he attempted to mail from the jail.  An individual does not lose constitutional protections while in pretrial detention.

---

[7] The defendant's appearance and proximity to the shooting created reasonable suspicion that the defendant was involved in the shooting.  *See United States v. Mouscardy*, 722 F.3d 68, 73 (1st Cir. 2013); *United States v. McCarthy*, 77 F.3d 522, 530 (1st Cir. 1996).

*See Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  The Fourth Amendment protects individuals against unreasonable government searches and seizures.  *Id.* at 558.  A Fourth Amendment search occurs when the government intrudes upon an individual's subjective and reasonable expectation of privacy.  *See Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018); *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  The reasonableness of a Fourth Amendment search "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  *Bell*, 441 U.S. at 559.

Here, the defendant had a subjective expectation of privacy in the letter.  The parties stipulated that the letter was placed into an envelope, and that the envelope was sealed.  *Cf. United States v. Whalen*, 940 F.2d 1027, 1035 (7th Cir. 1991) (no expectation of privacy in contents of letter where prison required inmates to leave letters unsealed).  The defendant also had a reasonable expectation of privacy in the letter.  The Inmate Handbook <u>does not</u> state that outgoing mail will be inspected.  *Cf. United States v. Taylor*, 2017 WL 11495616, at *8 (E.D. Mo. Feb. 24, 2017) (inmate handbook provided that all outgoing mail may be searched for contraband); *United States v. Solomon*, 2007 WL 1099097, at *3 (W.D. Pa. Apr. 11, 2007) (written policy informed all prisoners that outgoing mail may be inspected).  While the Inmate Handbook states that rejected outgoing mail will be returned to the inmate, and that incoming mail will be inspected, the Inmate Handbook does not suggest that rejected outgoing mail -- which never leaves the facility -- will be treated as incoming mail.

Moreover, other sections of the Inmate Handbook suggest, by inference, that outgoing mail <u>will not</u> be inspected.  In one section, called "Inmate Rights," the Inmate Handbook states that inmates have a right to uncensored correspondence.  In another section, called "Search Procedures," the Inmate Handbook states that unannounced searches will be conducted "of

inmates, inmates' living quarters and other areas of the facility," without any mention of outgoing correspondence.  Thus, in total, the Inmate Handbook creates a reasonable expectation of privacy in outgoing correspondence, such that when the jail inspects an outgoing letter, it conducts a Fourth Amendment search.

Whether such a search is reasonable is a separate question.  In *Stroud v. United States*, 251 U.S. 15, 21 (1919), the Supreme Court concluded that a letter written by a defendant in custody could be used against the defendant at trial because the defendant wrote the letter voluntarily, and the government came to possess the letter "under established practice, reasonably designed to promote the discipline of the institution."  Modern cases have clarified that prison officials do not have *carte blanche* to seize outgoing mail; they must be "prompted by a reasonable justification." *United States v. Brown*, 878 F.2d 222, 225 (8th Cir. 1989); *see also United States v. Whalen*, 940 F.2s 1027, 1035 (7th Cir. 1991); *United States v. Ligambi*, 886 F. Supp. 2d 492, 496 (E.D. Pa. 2012).  Concern for prison safety is among the concerns recognized as permissibly prompting the seizure of outgoing mail. *See Whalen*, F.2d at 1035; *United States v. Kelton*, 791 F.2d 101, 103 (8th Cir. 1986); *see also Stow v. Grimaldi*, 993 F.2d 1002, 1004 (1st Cir. 1993).

Here, Deputy Sheriff Sables testified that one way in which inmates communicate with each other at the jail is by writing "free" on the upper right-hand corner of an outgoing envelope, knowing that the envelope will be returned to someone else.  While "it is well established that prisons have sound reasons for reading the outgoing mail of their inmates," *Whalen*, 940 F.2d at 1035, and, as Deputy Sheriff Sables described, inmates can presumably send contraband to each other through rejected outgoing mail, Deputy Sheriff Sables also testified that when he inspected the defendant's letter, he had no specific information on the defendant being involved in any criminal activity.

In *Stroud*, 251 U.S. at 21, the Supreme Court highlighted that the government came to possess the seized letter through an "established practice." Here, however, the government has presented no evidence that it was the jail's "established practice" to inspect rejected outgoing mail. While an established practice need not be written, *see United States v. Brown*, 878 F.2d 222, 226 (8th Cir. 1989), Deputy Sheriff Sables testified only as to what occurred <u>in this case</u>. Even accepting that inmates may communicate with one another in the way Deputy Sheriff Sables described and that the government has a legitimate interest in monitoring such communication, inspection of the defendant's letter, absent any indication that it was the jail's established practice to do so or reason to think the defendant was involved in any criminal activity, was arbitrary. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976) ("The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."). The defendant's privacy interest in his letter, even if diminished by the fact of his pretrial detention, was not outweighed by a search that was neither individualized nor standardized.

Indeed, because the government presented no evidence that it was the jail's established practice to inspect rejected outgoing mail, this case is unlike the cases on which the government relies in its briefing. *See Smith v. Delo*, 995 F.2d 827, 832 (8th Cir. 1993) (describing a regulation requiring prisoners to leave certain outgoing mail unsealed); *Stow*, 993 F.2d at 1004 (describing a practice of requiring outgoing mail to be submitted for inspection in unsealed envelopes); *Whalen*, 940 F.2d at 1035 (citing federal regulation permitting prison officials to examine outgoing mail, which the prison requires inmates to leave unsealed); *United States v. Kelton*, 791 F.2d 101, 102 (8th Cir. 1986) (citing regulations requiring outgoing mail to remain unsealed and subject to inspection); *Smith v. Shimp*, 562 F.2d 423, 424 (7th Cir. 1977) (describing procedures in which

the jail spot-checks contents of all non-privileged outgoing mail).  Thus, the Court cannot conclude

that the jail's inspection of the defendant's letter was reasonable.  Accordingly, the search violated

the Fourth Amendment, and the letter must be suppressed.

## Conclusion

For the reasons stated, the defendant's motion is ***denied in part*** and ***granted in part***.  The

motion is denied as to the challenged statements and granted as to the seized letter.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**